# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 10, 2012

## STATE OF TENNESSEE v. CARRIE LYNN RONEWICZ

**Appeal from the Circuit Court for Tipton County**
**No. 6723     Joe H. Walker, Judge**

**No. W2011-01332-CCA-R3-CD  - Filed December 26, 2012**

After a trial by jury, the defendant was convicted of one count of theft of property valued at more than $1,000 but less than $10,000, a Class D felony.  She was sentenced as a Range I, standard offender to two years, with credit for time served and the balance to be served on probation as an alternative sentence.  The defendant now appeals, claiming that the evidence is insufficient to support her conviction and that the trial court erred by denying her motion to suppress evidence seized by police during a search of her property, both before and after the issuance of a search warrant.  For the reasons that follow, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ALAN E. GLENN, J.J., joined.

Gary Antrican, District Public Defender; and Parker O. Dixon, Assistant Public Defender, for the appellant, Carrie Lynn Ronewicz.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; Mike Dunavant, District Attorney General; and James Walter Freeland, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS AND PROCEDURAL HISTORY

On July 12, 2010, the defendant, Carrie Lynn Ronewicz, was indicted on one count of theft of property valued at $10,000 or more but less than $60,000, a Class C felony, in violation of Tennessee Code Annotated section 39-14-103.  On December 8, 2010, the

defendant filed a motion to suppress certain evidence seized by police during a search of her residence conducted on December 3, 2009. On December 10, 2010, the trial court held a preliminary hearing concerning the defendant's motion.

At that hearing, the defendant presented testimony from three witnesses. Detective Jack Howell of the Covington Police Department testified that he was aware of a report of an extensive theft that had occurred at an address on Main Street in the latter part of November of 2009. The victim, Christy Griffin, reported that at the time of the theft she was in the midst of moving from one residence to another. As a result, she had stored an extensive amount of property in boxes outside of her father's home. Much of this property was removed from that location. The items reported stolen included beds, chairs, furniture, dishes, clothing, medications, and numerous miscellaneous household items.

Detective Howell testified that on December 1, 2009, he received information from certain school officials that the defendant's young son had informed the victim's young son that the defendant was in possession of a laptop belonging to the victim's son. Based on that information, on the morning of December 3, 2009, he drove to the defendant's residence, accompanied by the victim. As they drove by the defendant's house, he and the victim saw certain items of property located in the yard outside, which the victim identified as having been stolen from her. Detective Howell testified that the specific items of property that he was able to see when he drove past the defendant's house with the victim included a black dining room table, bed linens, three dog houses, a trash can, and some type of hat or coat rack. He estimated that the time when this occurred was between 11:30 a.m. and 12:00 p.m.

Detective Howell testified that he did not immediately apply for a search warrant based upon the statements the victim made as they drove by the defendant's residence and that he did not apply for a search warrant until approximately 2:30 p.m. He testified that immediately after the victim identified certain items that he could see in the defendant's yard as stolen, he entered the defendant's property in an attempt to perform a consensual "knock and talk." He testified that during this process, he went to both the "front" and "back" doors of the defendant's property and knocked on them. He testified that it was his normal procedure to go to the back of a property and knock on the door located there if he received no response from the front door. He testified that he heard multiple dogs inside the residence but received no answer to his knock, and he remained unsure as to whether anyone was inside of the residence.

After entering the defendant's property with the victim, they were able to see additional property that the victim identified as stolen. From the sidewalk, they saw a van parked in the yard of the defendant's residence. After stepping a few feet onto the defendant's property, the victim was able to look through the window of this van and identify

family pictures, a box of assorted material, and an old wooden stove as belonging to her. The witness testified that as they were surveying the area, the victim would tell him where various unseen items or markings could be located in or on the property that was visible to them. For example, the victim told him that a box that she saw underneath a table would contain canned goods and that a dog house outside in the yard would contain a "Rolling Stones towel." These predictions proved correct.

The victim also identified a bed and other items that she could see through the defendant's window as belonging to her. While on the stand, Detective Howell was shown some pictures of the defendant's property, and he indicated on the photographs where various items had been discovered. Detective Howell testified that the backyard of the defendant's residence was fenced in, and he did not enter that portion of the defendant's property prior to receiving a search warrant. He testified that he did enter the defendant's front yard as well as the side yard where the "back" door to the residence was located. This side yard was visible from the street due to the fact that the property was located on a corner lot.

Detective Howell initially testified that he was concerned that the items that he had discovered would be removed if he left the premises to get a warrant. Consequently, he secured all of the property that was located outside of the residence that the victim had identified as stolen that he could see in plain view before departing. However, he later testified that there were officers of the Covington Police Department located on the defendant's property and he would not have had to worry about anyone removing property from the scene at any point after he conducted the knock and talk because those officers would have prevented anyone from removing the items.

Detective Howell testified that the defendant's van was located approximately three or four feet in front of the sidewalk by the residence. He testified that he called a tow truck for the van at around 11:55 a.m. He testified that the tow truck driver arrived around 2:00 p.m., and he estimated that the van was towed around 3:00 p.m. While on the stand, Detective Howell was shown a copy of a Covington Police Department "tow report," which listed the time that the defendant's vehicle had been towed as 2:00 p.m. The document also stated that the van had been inventoried, but the witness testified that this notation was incorrect. The witness testified that the van had, in fact, been locked and was not inventoried until he received the keys from the defendant's husband sometime later.

Detective Howell testified that he filled out a "property receipt" for the items that he seized. He testified that he was physically located on the defendant's property while he was securing these items and arranging to have the defendant's van towed but that he did not enter the defendant's residence until after he had received the search warrant. Detective Howell testified that he listed some items that he had already seized in his application for the

-3-

search warrant, and relied on those items in seeking permission to search the defendant's property. Detective Howell testified that after the search warrant was signed, he entered the defendant's house with the victim and the victim walked room-to-room throughout the house identifying items as belonging to her. He testified that approximately six or seven officers entered the residence as well, and an officer accompanied the victim "almost everywhere" she went throughout the house.

While on the stand, Detective Howell was shown a "property receipt" that listed an inventory of the items seized by police. Detective Howell testified that over one hundred items were listed on that inventory. Detective Howell testified that roughly seventy or seventy-five percent of the items seized were claimed by the victim. Detective Howell testified that some of the items listed as seized actually belonged to the defendant and her family. He explained that these items had been located inside of property claimed by the victim, such as personal items belonging to the defendant that were discovered inside of the victim's dresser drawers.

Detective Howell testified that between 2:30 p.m. and 2:45 p.m., the defendant and her husband drove by the residence. Detective Howell testified that they continued to drive around the block. He entered his vehicle and followed them. He testified that eventually the defendant and her husband returned to their home.

Following Detective Howell's testimony, the defendant attempted to call to the stand the tow truck driver who had towed her van. However, when the State agreed to stipulate that the van was towed at 2:00 p.m.—prior to the issuance of the search warrant—the witness was excused.

The defendant's daughter testified that she was fifteen years old. She testified that on December 3, 2009, she arrived home from school at 2:00 p.m. to discover "a bunch of people like scattered in our front yard." She testified that these individuals were entering her house and trying to remove items, claiming that the items did not belong to her family. She testified that these individuals told her that the property was stolen and that her family had stolen it. She testified that she believed that these individuals were detectives and police officers based on their appearance. The defendant's daughter testified that when she arrived her parents were already at the residence and their van was missing.

She testified that when she entered her residence, the individuals informed her that she was not allowed inside. She testified that she told the individuals "it's my house, so I'm allowed to do what I want." She testified that the individuals inside of her house were "going through my things, which really made me mad." She testified that she tried to argue with one of the individuals but was told that if she did not leave the residence, she would be placed

in the back of a squad car.

The defendant's daughter testified that while she was inside of the house, she saw "a woman" running around claiming that all of their things were hers. The defendant's daughter testified that this woman entered her bedroom and began digging through her underwear drawer. She testified that this woman was inside of her bedroom for approximately an hour to an hour and a half and was alone for at least twenty minutes of that time without any police officer present.

The defendant's daughter also testified that the police seized their beds during the search. She testified that when the police could not take these beds apart, they called in "random" "worker men" to do so. She testified that one of these individuals was "scary in a weird way" and he kept flirting with her, asking how old she was, and rifling through her underwear. She testified that she became so afraid of this strange worker that she left her room, and shortly afterward the men dropped part of one of the beds.

The defendant's daughter testified that the entire search process took approximately four hours and that her mother was arrested and placed in the back of a squad car approximately halfway through the process. She testified that during the search process someone called for a "giant" U-Haul type trailer, which arrived at their residence around 3:00 p.m. She testified that individuals began bringing items out of her family's house and placing them inside of the trailer. She testified that throughout this process, the individuals involved acted "mean," laughing about the fact that they were able to enter her home. Someone knocked over their garbage can, and individuals started rummaging through it.

On cross-examination, the defendant's daughter testified that her family had been living at the residence for approximately three months when the search occurred. She testified that sometime after November 21, 2009, her brother had received a "crappy" computer which displayed the first name of the victim's son. She testified that they had obtained this computer at a yard sale, and she was aware that her brother had asked the victim's son for the computer's password.

Lieutenant Allen Wilson of the Covington Police Department testified that he had been with the department for twenty-four years. He testified that on December 3, 2009, he was called to the defendant's residence to assist with a search. He testified that he arrived at the same time as Detective Howell—which he estimated was between 1:00 p.m. and 2:00 p.m. He testified that it was not morning when they arrived.

Lieutenant Wilson testified that there were several household items located in the yard surrounding the defendant's house. These items included a laundry basket, an ironing board,

a dog cage, and some shower curtains. He testified that when he walked onto the defendant's property he could see into the back of the defendant's van, and it contained several photographs. He testified that he believed that these items were stolen because Detective Howell had a list of items that had been recently stolen from the victim's house, and "it was identical to the stuff that we were looking at in the back of this house." However, Lieutenant Wilson testified that these items were common household items, and it would have taken someone familiar with them to recognize that they were stolen.

Lieutenant Wilson testified that he observed Detective Howell knock on the doors to the residence, starting with the "back" door and then moving to the front door. Lieutenant Wilson testified that the purpose of attempting this "knock and talk" was to determine if the defendant could explain why there was stolen property located in her "backyard." He testified that no one responded to these knocks. He testified that because he had seen items that had been allegedly stolen and because he had seen the victim's family pictures in the back of the defendant's van, he and Detective Howell decided to obtain a search warrant. He testified that they left to get the search warrant immediately after no one responded to the knocks. He testified that the victim was not taken onto the property until after the issuance of the search warrant. He testified that they did not enter or seize any property until after they received the search warrant. He testified that he was not sure whether the van was towed before the warrant arrived. However, he testified that they would not have searched the contents of the van before receiving the search warrant.

Lieutenant Wilson testified that after the search warrant was signed and he had returned to the defendant's home, he saw the defendant's car drive by the end of the street. He testified that the defendant's vehicle slowed down and he saw the defendant and her husband look at him before departing up the street. He testified that Detective Howell and another officer chased after them and eventually got them to circle around the block and return to their residence. He testified that once they had located the defendant and her husband, they had no reason to believe that anyone would remove any stolen property from the residence.

Lieutenant Wilson testified that afterward, he participated in the execution of the search warrant. He was shown a "property receipt" of items, which he claimed listed items that were discovered in the defendant's "backyard." The witness acknowledged that the time listed on this receipt was 1:51 p.m.

After receiving this evidence, the trial court denied the defendant's motion to suppress from the bench. In a written order issued December 16, 2010, the trial court explained that the items located in the defendant's yard were lawfully seized because they had been discovered in plain view by lawfully positioned officers. The trial court reasoned that the

officers had the legal right to approach the defendant's house for purposes of knocking on the door and speaking with anyone who answered. The trial court held that the incriminating nature of the items they viewed from the street and from the defendant's property while conducting the knock and talk was immediately apparent to the officers involved, because the victim was present and identified the property as stolen.

The trial court held that the observation of stolen items by the officers from the street and during the knock and talk provided a lawful basis for the issuance of the ensuing search warrant. The trial court found that there was no warrantless entry into the house, and consequently held that none of the items found therein were subject to exclusion.

The trial court found that the defendant's van was seized before the search warrant was obtained but also found that there was no entry into the van until after the search warrant had been issued. The trial court held that the observation of various stolen items located inside the van provided "reasonable cause" for the police to have the van towed and that the van was subsequently searched pursuant to a valid search warrant. The trial court also reasoned that the van could have been searched without a warrant because it had been lawfully impounded and was thus subject to a routine administrative inventory search.

Prior to trial, the charge against the defendant was amended to theft of property valued at more than $1,000.00 but less than $10,000.00, in violation of Tennessee Code Annotated section 39-14-103, a Class D felony. The defendant's trial was held on December 15-16, 2010.

The first witness for the State was Detective Jack Howell, who testified concerning his investigation in a manner generally consistent with his testimony at the pretrial hearing concerning the defendant's motion to suppress. In addition, Detective Howell added that the defendant spoke with him when she was in the back of his squad car on the day of the search. Detective Howell testified that the defendant claimed that the family pictures that police had seen in the back of her van were pictures of her own grandparents. Detective Howell authenticated numerous pictures of the defendant's residence and various seized items, as well as a list of seized property. These were entered into evidence.

Detective Howell testified that among the items seized by police was a Radio Shack tape recorder with the victim's voice on the tape and a Sony camera containing digital photographs of the victim. In addition, Detective Howell testified that: (1) a computer that was seized bore the name of the victim's son; (2) a desk that was seized contained a composition book bearing the name of the victim's son; and (3) a box that was discovered in the defendant's bedroom contained multiple prescription pill bottles, each bearing the victim's name.

-7-

On cross-examination, Detective Howell testified that he had never been to the victim's residence and that he had never seen any of the items that were seized by police at that location. He testified that he did not know if the victim had ever been to the defendant's residence prior to the day of the search. Detective Howell testified that he believed that all of the items that were removed from the victim's property could have been removed by a single moving van, because he knew that all of the items that were removed from the defendant's home fit into a single eighteen foot trailer. Detective Howell testified that when he first arrived at the defendant's house on the day of the search, he was accompanied by "Lieutenant Wilson" and "Detective Ford."

Detective Howell testified that he had no way of determining how long ago the voice heard on the audio tape that was found inside of the seized tape recorder had been recorded. He also had no way of determining if the defendant had ever heard that tape or if she had ever turned on the digital camera and seen the pictures of the victim that it contained. Detective Howell testified that the desk he discovered in the defendant's living room bore the victim's son's name on one of the inside drawers and also had an old antique design, which was "pretty distinguishing" and which had been described to him by the victim in advance. However, Detective Howell acknowledged that merely seeing a name written on the inside of a desk would not necessarily reveal to the viewer that the desk was stolen property.

Detective Howell testified that although the victim went room-by-room through the defendant's house on the day of the search and went through all of the defendant's drawers, she would not have been able to move items around or otherwise disturb the contents of those drawers. Detective Howell explained that during the search process police officers would open containers (such as the drawers of a desk), and afterward the victim would examine the container's contents and indicate which items were hers. After she had done so, any items that she identified would be "set over to the side and then taken into the front room to be added onto the property list." Detective Howell admitted that more total items were returned to either the victim or the defendant than were listed as seized on the inventory. Detective Howell explained that this occurred because some additional items of property were discovered located inside of other property. For example, inside of one small wooden chest of jewelry, a watch belonging to the defendant's husband and several dollar bill coins belonging to the defendant's children were discovered, and these items were returned to the defendant's family. Detective Howell testified that some property, including a set of bunkbeds, had not been returned to either party and was still in the possession of the police because they were still unsure which individual was the rightful owner.

The next witness for the State was the victim, Christy Griffin. The victim testified that in November of 2009 she was in the process of moving. She testified that during that

time she boxed up many of her belongings and stored them behind her father's house in a partially enclosed carport/garage area, because she was waiting for a new house to become available. She testified that she last saw these belongings on November 21, 2009, and when she went back to check on them on November 23, 2009, all of the items were gone with the exception of a few of the heavier items, such as a washer and dryer. She testified that she had given no one, including the defendant, consent to remove these items.

The victim testified that she was previously acquainted with the defendant, as the defendant was a "notable" patron of the Tipton County Library, where she worked. The victim testified that the last time the defendant was in the library, she (the defendant) refused to leave at closing time. The victim testified that she (the victim) eventually shut off the library's Internet, causing the defendant to lose a lengthy document that she had been in the process of typing. The victim testified that the defendant became very upset after losing her document. After leaving the library that evening, the victim stopped by her father's house to retrieve some items for her dog out of the belongings she had stored there.

The victim was shown a list of items drawn from a "property list." The victim testified that all of the items on that list were taken from her. These items included a leather chair, which the victim testified was valued at $250, a wooden desk, which the victim testified was valued at $700, and a futon and mattress set, which the victim testified was valued at $650. The victim testified that her children had two custom BMX bikes, which she valued at $1100.00 each, which were also taken. She also testified that her son's laptop computer, which she valued at $650, was taken. The victim testified that many items with sentimental value, which she testified were "priceless," were also taken—including her children's Christmas ornaments, one of which had been given to her oldest son by his great-grandmother. The victim testified that in addition to the items appearing on the list that she had been shown, numerous additional items were taken from her.

The victim testified that sometime after the theft, she was informed by her son that the defendant's son had indicated to him that he was in possession of her son's computer. She testified that she notified the Covington Police Department and was eventually contacted by Detective Howell. She testified that Detective Howell asked her if she would be able to identify the items stolen from her, and she told him that she would try to do so. She testified that Detective Howell drove her by the defendant's home, and she recognized several items that were sitting to the side of the defendant's house (between the house and the driveway) as belonging to her. She testified that these items included a black table with a green floral arrangement and an ironing board with a broken leg. She testified that after seeing these items she remained in the car while Detective Howell went to knock on the front and "back" door of the defendant's residence. Afterward, Detective Howell walked her over onto the defendant's driveway, and she looked through the window of the defendant's van and saw

several additional items that belonged to her located in the back—including a broken picture frame with a picture of her great-grandparents and several boxes. She testified that after this, she was told to leave until the police obtained a search warrant, and she did so.

The victim testified that when she returned to the defendant's residence after the police obtained a search warrant, the defendant's van was already gone and the defendant and her husband were outside. She testified that she went into the defendant's house, saw a book that she recognized, and picked it up. She testified that a police officer asked the defendant if the book belonged to her, and the defendant replied: "Oh yes, that's mine." She testified that she opened up the book and showed the police officer that the book had her son's name written in magic marker on the inside cover. In addition, the victim testified that she told Detective Howell that a "Rolling Stones" beach towel would be found inside of a dog carrier before she looked inside of it, and the towel was indeed found there. The witness testified that her son had scratched his name into the side of his laptop computer and that marking was found there when the computer was recovered. The victim testified that she discovered items that belonged to her throughout the defendant's house, in every room except the bathroom.

The victim testified that while the search was being conducted the defendant was still claiming ownership of all of her stolen items. The victim testified that the defendant repeatedly stated: "You can't take those" and "I have proof that I got that stuff from a yard sale." The victim testified that the defendant never told the officers where this yard sale was located.

On cross-examination, the victim testified that the defendant had been banned from the public library because of inappropriate behavior. The victim testified that on the evening that she and the defendant had their encounter at the library, the defendant was still located in her van in the library parking lot when she (the victim) left.

When defense counsel asked the victim why she left so many valuable items—including "priceless" items which she claimed held considerable sentimental value—outside and exposed to the weather in the middle of November, the victim avoided answering the question. The victim also testified that she did not witness her property being stolen, and consequently she could not state based on firsthand knowledge who had originally removed the property.

Following this testimony, the State rested, and the defendant took the stand in her own defense. The defendant testified that although she was not rich, shortly before Christmas she had saved up some money that she intended to use to buy some extra things. She testified that she and her daughter stopped at a yard sale on Highway 51 in Tipton County near a blue

house trailer and looked around. She testified that she saw a desk and chair, two large chests, and some TV trays that she wanted to purchase for her children, and she did so. She testified that she returned home, took the seats out of her van, and returned to the yard sale to load the items. The defendant testified that "the other lady" at the yard sale helped her load a black table and some other furniture items into her van. The defendant testified that they left these items in her van for two days.

The defendant initially testified that she did not purchase any other items that day, claiming that it was too late in the evening to do so. A short while later, however, the defendant testified that on the night of the yard sale she also purchased two bicycles, a rocking chair, a broken ironing board, a lamp, and computer. The defendant also testified that "the woman" at the yard sale told her that she could have several extra things because she was a mother. The defendant testified that when she told "the woman" that she had five children, "the woman" said "you can have these boxes of stuff," and the defendant loaded them into her van without knowing what was in them. She testified that she spent around $400.00 in all that day and that she did not receive a receipt for any of the items that she purchased. She testified that the "three women" who sold her the items left after helping her load the items into her van, and she never saw them again.

The defendant testified that she did a lot of shopping at yard sales. She testified that she had five children and she tried to give them everything that she could so they could have a better life. The defendant testified that she had never seen this particular yard sale before although she had seen yard sales at the same location frequently since she moved into the area. The defendant testified that this location "was more or less not like just a yard sale but a flea market," and as a result she was able to return to the area to try to "find out who the woman that took the stuff from [the victim] was." She testified that despite returning to the yard sale's location on numerous occasions, she was never able to locate "the woman," and she was told in response to her inquiries that "people that do come up there do get run off."

The defendant testified that she had never stopped to shop at any of the yard sales at this particular location previously because she had never had any extra money with which to shop. She testified that she would never take anything from a child. She testified that while the events that had transpired had hurt the victim, they had also hurt her and her children, and "it wasn't my fault, and it's not her fault." Contrary to the victim's testimony, the defendant testified that she had "paid no attention" to the victim at the library at any point.

The defendant testified that she first learned about "the computer" from her daughter. She testified that her daughter started going through one of the boxes that they had been given at the yard sale, discovered a laptop computer inside, and brought it to her attention.

The defendant testified that her daughter plugged in the computer and her eight-year-old son noticed the name of his classmate—the victim's son—coming up on the screen. The defendant testified that she told her son to go to school and ask his classmate concerning the computer. She testified that she believed that her son had done so.

The defendant testified that she first became aware of police involvement in the matter when police officers went to her children's school and asked her children if she or her husband had ever beaten or otherwise hurt them. She testified that she did not beat her children. She testified that "DHS" came to her house as a result of the incident.

The defendant testified that the first time she actually encountered the police was around 2:15 p.m. on December 3, 2009. She testified that on that date she returned home and tried to pulled her Cadillac in behind her minivan, only to discover that her minivan was gone. She testified that there were numerous police officers on the scene. She testified that she initially assumed that the officers were there because her van had been stolen. The defendant testified that the police informed her that they had a search warrant but never showed it to her.

The defendant testified that the police officers told her that she had to put her dogs away or they were going to shoot and kill them. She testified that as she was attempting to secure the dogs, she discovered that the dog kennels that she had bought from Petco were gone, and the bunkbeds that she had bought off of Craig's List for her children were missing. She testified that she never had a chance to tell any of the police officers that the items that they were taking belonged to her, because when she got up from her sofa after the victim came into her home she was placed into the back of a squad car. She testified that she was in the squad car for about two hours watching her belongings being removed from her home. She testified that at one point she became very irate because she saw the victim rolling out luggage containing baseball cards that she and her husband had been collecting for fifteen years. The defendant testified that many of the items that were taken from her house were not listed on the police inventory of seized property. The defendant testified that as a result of the wrongful seizure of her possessions by the police, her "babies" had to sleep on the cold floor.

On cross-examination, the defendant claimed that she was "broke" and did not even have the money necessary to file for bankruptcy. The State then asked the defendant about numerous pictures and statements appearing on her MySpace account, including statements such as "money is where it's at," and a picture depicting her in front of a wad of cash with the caption "this is how I roll." The defendant claimed that those pictures were taken and those statements were made eight years earlier, before she lost over $30,000 investing on a home.

The defendant was also questioned extensively concerning the yard sale about which she had just testified. The defendant claimed that she had tried to give police officers details concerning the yard sale while her home was being searched, but the officers would not listen. The defendant also testified that she told Detective Howell the location of the yard sale when she met with him in his office on the Monday following the search.

The State asked the defendant if the yard sale at issue was selling only items that had been stolen from the victim. The defendant responded that she did not know. The defendant testified that there was "a whole bunch of other stuff" located at the sale which she did not purchase because most of it was "just plain junk that had been sitting outside in the rain."

The defendant was asked concerning two boxes—one labeled "house" and the other labeled "books"—that the State's witnesses had testified had been discovered in her van. The defendant testified that those boxes were not actually in her vehicle, and speculated that the police had put them in her vehicle after they had towed it. When asked concerning other items that the State's witnesses had testified had been discovered inside of her house, the defendant testified that she did not know whether these items had in fact been located at her house because they were "a bunch of garbage."

The defendant's daughter also took the stand for the defense and testified concerning the search of their home by the police. The defendant's daughter testified, that during the search, police officers removed numerous items that she and her mother had purchased at a flea market. The defendant's daughter testified that these items were sold to them by three or four women. She testified that one of these women "had short, brownish looking hair and glasses, and she was wearing pants, a longsleeved sweater/shirt thingy." She testified that they paid $420.00 in all for the items. Some of the items had price tags on them while others did not.

The defendant's daughter testified that after returning home with the newly-purchased items, they put some of them away but left others sitting in their van. The defendant's daughter testified that she looked through one of the boxes one day because she was bored, and she found a computer. She testified that this computer was damaged.

On cross-examination, the State asked the defendant's daughter if she knew whether her younger brother had told the victim's son, his classmate, that he had the victim's son's computer. The defendant's daughter testified that she believed that her brother had done so and that he had done so at their mother's request. The State asked whether her mother had punished her brother for doing so, and the defendant's daughter testified that she had not. The State then asked the witness whether there had been any investigation concerning whether her brother had been punished, and the witness acknowledged that some police officers had come

to their school and asked them some questions that "did not make sense." When the State asked the witness whether the questions had to do with some bruises seen on her brother, the witness explained that this bruising had resulted from her brother running around outside and playing with animals.

The defendant's daughter initially testified that during the police search she did not tell any of the officers where the yard sale had been located "because they kept like telling me to shut up and not talk." She later testified that she told one of the officers that she could show them the precise location of the yard sale, but he responded by telling her to be quiet. She did not initially know the name of this officer, but she was able to identify him later in open court as Lieutenant Alan Wilson of the Covington Police Department. She further testified that she told this individual that "the ladies" might still be at that location.

The defendant's daughter testified that she had been to yard sales with her mother on two prior occasions in another county. The defendant's daughter testified that the yard sale at issue consisted of two or three small tents, a few tables, and a tarp on the ground. The defendant's daughter also testified in detail concerning the location of various items at the yard sale. She testified that they moved everything from the yard sale in one trip of their van after returning home and removing its seats. She testified that she and her mother loaded the van by themselves and that her younger brother was not with them. She testified that she and her mother purchased a chest of drawers at the yard sale and that they loaded this chest of drawers into the van by themselves. She testified that there were a lot of items still remaining at the yard sale after they finished loading their van.

The defendant's daughter testified that she did not see the computer or digital camera while they were at the yard sale. Instead, she found them later in one of two or three boxes that had been given to them by "the ladies" "because basically they were done making money for the day, had some leftover garbagy stuff, and they just said, here, take it with you." The defendant's daughter agreed that they had been lucky to receive a digital camera and a laptop in a garbage bag, but she testified that the computer basically didn't work and the laptop was "garbage."

The defendant's daughter testified that they did not buy a metal bunk bed, a futon, or any mattresses, sheets, or dog carriers at the yard sale. When the State asked the defendant's daughter if she knew anything about a "Rolling Stone [sic]" towel that the victim had identified as being in one of the pet carriers before seeing it, the witness testified that she initially discovered this towel "in like the bottom of a box that we had got, and it was really stinky and nasty." She further testified that after initially moving the towel outside, one day they decided to placed it in the bottom of a dog carrier, because their dogs were cold. She testified that she had no idea how the victim could have discovered that they had done this

-14-

simply by driving by their house.

Following this testimony, the defense rested, and the State recalled Detective Jack Howell as a rebuttal witness. Detective Howell testified that he spoke with the defendant on the Monday following the search of her residence, and she did not tell him that she knew the location of the yard sale or flea market where she claimed to have bought the items belonging to the victim—nor did the defendant identify that yard sale as being "somewhere up 51 Highway." Detective Howell further testified that the defendant never told him at any point that she could take him or any other police officer to the location of the sale, nor did she ever give him a physical description of "the ladies" that were at the sale. Detective Howell also denied ever telling the defendant that he could take all of her property, put it into a judge's trust fund, and have it sold.

On cross-examination, Detective Howell testified that he never taped any of the conversations that he had with the defendant despite the fact that it would have been easy for him to have done so. The witness initially claimed that there was no reason for him to record any of these meetings but later acknowledged that such tapes could have provided him with "good" evidence.

Lieutenant Allen Wilson of the Covington Police Department testified in rebuttal that he was involved in the execution of the search warrant of the defendant's home on December 3, 2009. He testified that he saw the defendant's daughter during that search. He denied that she had ever told him that she could show him where the yard sale was located or had ever claimed that "the ladies" might still be there. Lieutenant Wilson testified that while the defendant had claimed that she had purchased many of the items that were seized at a yard sale, she never provided him with any details that might help him locate that sale despite his expression of interest on the subject.

Lieutenant Wilson also testified that he was present on several occasions when the defendant came to the police station to talk with Detective Howell and that during those meetings he never heard the defendant give Detective Howell the yard sale's location or offer to take them there. He testified that they would have gone to investigate the location if they had received any such information.

On cross-examination, Lieutenant Wilson initially indicated that it was his normal procedure to record statements made by the criminal suspects because such recordings could be used against the suspects in court. He indicated that he did not tape any of the statements made by the defendant during her meetings with Detective Howell because she was talking to Detective Howell rather than to him. Later in his testimony, however, Lieutenant Wilson testified that they generally (and he in particular) never taped statements made by criminal

-15-

defendants and only memorialized such statements in writing. He testified that he was not aware of any written statements concerning any of the defendant's multiple visits to the police department.

Following this testimony, the State rested its rebuttal case, and the parties gave closing statements. The trial court instructed the jury, and the jury retired to deliberate at 12:31 p.m. on December 16, 2010. At 1:57 p.m. that same day, the jury returned with a verdict finding the defendant guilty of theft of property valued at $1000 or more but less than $10,000. The defendant's bond was revoked, but the trial court allowed her to say goodbye to her children in light of the fact that it was her birthday.

On January 11, 2011, the defendant was sentenced to two years, with credit for thirty days served and the balance to be served on supervised probation as an alternative sentence. The defendant filed a motion for new trial on February 8, 2011, which was denied following a hearing on June 7, 2011. A notice of appeal was filed on June 15, 2011. Our decision follows.

## ANALYSIS

The defendant claims that the evidence is insufficient to support her conviction and that the trial court erred by denying her motion to suppress evidence seized as a result of the police search of her property on December 3, 2009. For the reasons that follow, we deny the defendant's claims and affirm the judgment of the trial court.

### I.

The defendant claims that the evidence is insufficient to support her theft conviction. The relevant law governing appellate review of this type of claim was recently summarized by the Tennessee Supreme Court:

> Appellate courts evaluating the sufficiency of the convicting evidence must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, on appeal a defendant bears the burden of showing why the evidence is insufficient to support the conviction. *State v. Parker*, 350

S.W.3d 883, 903 (Tenn. 2011). This Court affords the State the strongest legitimate view of the evidence presented at trial and the reasonable and legitimate inferences that may be drawn from the evidence. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). This Court neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury. *Bland*, 958 S.W.2d at 659. Circumstantial and direct evidence are reviewed under the same standard of review. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt. *Id.* at 381.

*State v. Carl J. Wagner*, 2012 Tenn. LEXIS 746, at **18-19 (Tenn. Oct. 12, 2012).

The defendant in this case was convicted of theft. "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a) (2009). "Theft of property or services is . . . [a] Class D felony if the value of the property or services obtained is one thousand dollars ($1,000) or more but less than ten thousand dollars ($10,000). . . ." T.C.A. § 39-14-105(a).

In this case, the defendant herself acknowledged on the stand that she in fact exercised control over numerous items belonging to the victim. The victim testified that she did not give the defendant or anyone else her consent to exercise control over those items of property. The victim also testified concerning the value of the various items that were stolen from her and later discovered in the defendant's possession, and the value of those items exceeded $1,000.00. The jury's conclusion with respect to each these elements is thus supported by the record, and the defendant does not challenge the jury's conclusion with respect to any of these elements on appeal.

Rather, the defendant challenges only the jury's conclusion concerning her intent, claiming that she did not intend to deprive the victim of ownership of the property at issue. In support of this contention, the defendant directs our attention to her own testimony (and

-17-

that of her daughter) to the effect that she bought all of the items at issue at a yard sale, and was thus presumably unaware that they were stolen. The defendant claims that "[t]he State produced no evidence that refuted [the defendant's] reasonable explanation of the circumstances under which she obtained [the victim's] property."

The defendant is correct that there is no direct evidence in the record bearing on her *mens rea* or proving that she was the one who removed the property from its original location. However, a conviction may be supported solely by circumstantial evidence, *see Dorantes*, 331 S.W.3d at 379, and the circumstantial evidence in the record suggesting that the defendant intentionally dispossessed the victim of the property at issue is compelling.

The victim testified that the defendant became angry with her following a dispute at the local library shortly before the theft. The victim further testified that the defendant was still on the premises when she left the library to go to her father's house to obtain some of the items that she had stored there. From this testimony, a jury could reasonably conclude that the defendant had both the means and the motive to commit the theft at issue.

Law enforcement witnesses testified that the defendant drove past them and circled the block when she saw that the police were at her home on the day of the search, and did not return until after they began pursuing her. From this, a jury could reasonably infer that the defendant possessed a guilty mind. State witnesses also testified that the defendant was found in possession of a desk, laptop computer, and prescription pill bottles clearly bearing the victim's name or the name of one of the victim's family members. A law enforcement witness also testified that the defendant was found in possession of a tape recorder bearing a tape of the victim's voice and a digital camera bearing pictures of the victim's family. A reasonable jury was free to infer from these facts that the reason that the defendant was in possession of all of these personal items so soon after they were stolen from the victim was because she was, in fact, responsible for taking them.

We note that there are some significant credibility problems with the defendant's version of events. For example, the defendant's testimony conflicts with her daughter's testimony with respect to important details concerning how they acquired the stolen property, such as whether they loaded all of the large pieces of furniture that they purchased that day into their van by themselves or whether one of "the ladies" assisted them. In areas where their testimony was consistent, it still failed to explain all of the events that even they acknowledge transpired—for example, while both witnesses agreed that they had previously purchased one of the pet carriers at issue from Petco, neither one of them could explain how the victim knew that this pet carrier contained a "Rolling Stones" towel before looking inside of it, and neither witness disputed that this had occurred. Crediting the defendant's testimony also requires a belief in the occurrence of numerous individual, seemingly improbable events, such as that:

-18-

(1) a thief would sell so many stolen items at the same time to the same person, and all in the same vicinity as the theft; (2) the defendant just happened to spontaneously buy such a large quantity of items—so many of which had once belonged to the same individual—simultaneously at a yard sale; (3) the defendant would happen to be acquainted with the individual who had once owned all of these items, and their sons would just happen to be classmates; (4) "the ladies" who ran the yard sale would give away seemingly valuable items—including a laptop computer and digital camera—to the defendant for free so soon after charging her $5.00 for a broken ironing board and $20.00 for some used TV trays; and (5) the defendant was able to buy all of these valuable personal items and furniture for a grand total of $420.00, and also failed to obtain any sort of proof of purchase after she had done so. These and other credibility issues are apparent even on a cold reading of the record on appeal.

However, the decisive factor in this case is simply the fact that the direct evidence presented by the defendant conflicted with the circumstantial evidence presented by the State, and when such a conflict occurs, we are not the ones who resolve it. The jury resolved the conflicts in the evidence that was presented to it against the defendant, and this court does not re-weigh credibility issues or reconsider a jury's resolution of conflicts in the evidence on appeal. *Wagner*, 2012 Tenn. LEXIS 746, at **18-19. Direct evidence is not entitled to more deference than circumstantial evidence, and circumstantial evidence alone suffices to support a conviction. *Dorantes*, 331 S.W.3d at 381. The defendant's claim that the evidence is insufficient to support her conviction is denied without merit..

## II.

The defendant claims that the trial court erred by denying her motion to suppress evidence that was discovered and seized by police during the search of her property that occurred on December 3, 2009. We disagree.

On appeal, the losing party bears the burden of demonstrating that a trial court's decision concerning a motion to suppress was erroneous. *State v. Harts*, 7 S.W.3d 78, 84 (Tenn. Crim. App. 1999). We review a trial court's decision concerning a motion to suppress under the standard established in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). *See R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008). As our supreme court explained in *Odom*, with respect to a trial court's factual findings:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn

-19-

from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

*Odom*, 928 S.W.2d at 23. "[I]n evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998). "[O]ur review of a trial court's application of law to the facts is conducted under a de novo standard of review." *R. D. S.*, 245 S.W.3d at 362.

Both the federal and state constitutions contain provisions protecting individuals from unreasonable searches and seizures. *See* U.S. CONST. AMEND. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."); TENN. CONST, ART. 1, Sec. 7 ("[T]he people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures."). A warrantless search or seizure is presumed to be unreasonable—and any resulting evidence may be subject to suppression under the well-known exclusionary rule—unless the State demonstrates that the search or seizure at issue was conducted pursuant to one of the narrowly-defined exceptions to the warrant requirement. *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). Even evidence that has been discovered and seized by police pursuant to a lawfully-issued warrant may be subject to exclusion, if the defendant can establish that this evidence was "the fruit of the poisonous tree"—meaning the direct result of a prior illegal act by police *See, e.g., Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *State v. Clark*, 844 S.W.2d 597, 600 (Tenn. 1992) ("The exclusionary rule may operate to bar the admissibility of evidence directly or derivatively obtained from an unconstitutional search or seizure.").

One important exception to the warrant requirement is the "plain view" doctrine. As the Tennessee Supreme Court has explained, under the auspices of this doctrine, "[i]t has long been settled that objects which fall in the 'plain view' of an officer, who has the right to be in that position, are subject to seizure." *Armour v. Totty*, 486 S.W.2d 537, 538 (Tenn. 1972). Stated another way, it is "the many times recognized rule that constitutional rights are not violated when a law officer, without any trespass against the defendant, and while he is at a place he has a right to be, looks and sees evidence against a defendant which is plainly visible." *Sneed v. State*, 423 S.W.2d 857, 860 (Tenn. 1968). "[T]he plain view doctrine applies when (1) the items seized were in plain view; (2) the viewer had the right to be in the position to view the items; (3) the items seized were inadvertently discovered; and (4) the incriminating nature of the items was immediately apparent." *State v. Cothran*, 115 S.W.3d 513, 524-525 (Tenn. Crim. App. 2003); see also *Totty*, 486 S.W.2d at 537.

Another important exception to the warrant requirement is the doctrine that has become known as the "automobile exception." As the Tennessee Supreme Court has recently explained:

> The "automobile exception" to the warrant requirement permits an officer to search an automobile if the officer has probable cause to believe that the automobile contains contraband. *Carroll v. United States*, 267 U.S. 132, 149, 45 S. Ct. 280, 69 L. Ed. 543 . . . (1925). The rationale for the automobile exception is two-fold. *Pennsylvania v. Labron*, 518 U.S. 938, 940, 116 S. Ct. 2485, 135 L. Ed. 2d 1031 (1996); *California v. Carney*, 471 U.S. 386, 392-93, 105 S. Ct. 2066, 85 L. Ed. 2d 406 (1985). First, it is often impractical for officers to obtain search warrants in light of the inherent mobility of automobiles. *Carney*, 471 U.S. at 393. Second, individuals have a reduced expectation of privacy in their automobiles. *Id.* If the officer has probable cause to believe that the automobile contains contraband, the officer may either seize the automobile and then obtain a warrant or search the automobile immediately. *Chambers v. Maroney*, 399 U.S. 42, 52, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970). "Given probable cause to search, either course is reasonable under the Fourth Amendment." *Id.*

*State v. Saine*, 297 S.W.3d 199, 207 (Tenn. 2009). Neither the federal nor the state constitution requires the existence of exigent circumstances for the automobile exception to apply.[1]

With these principles in mind, we proceed to review the defendant's claim concerning the specific seizures that occurred in this case. For analytical purposes, we divide the numerous items of evidence seized by police into four categories: (1) items that were seen by Detective Howell, other officers, and the victim while they were still located on the public roadway (*i.e.* during their initial drive-by of the defendant's home), which by his testimony were seized prior to the issuance of a search warrant; (2) items that were seen by Detective Howell while he was located on the defendant's property as he approached the defendant's residence in an attempt to perform a consensual "knock and talk," which by his testimony were also seized prior to the issuance of a search warrant; (3) items seen as a result of Detective Howell and the victims' act of peering through the windows of the defendant's van

---

[1] *Nolan v. State*, 588 S.W.2d 777, 780-81 (Tenn. Crim. App. 1979), relied on by the defendant for the proposition that an automobile may not be searched without a warrant absent exigent circumstances, was overruled by *State v. Leveye*, 796 S.W.2d 948, 953 (Tenn. 1990) (adopting the federal interpretation of the automobile exception and "overruling all cases to the contrary").

and the van's subsequent seizure, which the State has conceded occurred before the issuance of the search warrant, and (4) items seen and seized on the defendant's property and inside of her residence after the issuance of the search warrant.[2] For varying reasons, we conclude that the trial court did not err by denying the defendant's motion to suppress with respect to each these categories of seized evidence.

With respect to the items seen by the officers while they were still located on public property, the trial court correctly determined that these items could be seized without a warrant pursuant to the plain view doctrine. The testimony of law enforcement witnesses supports the trial court's conclusion that these items were located in plain sight. Police officers unquestionably have the right to be located on public roadways, and thus they were lawfully positioned when they viewed the incriminating items. The defendant does not dispute that these items were discovered inadvertently.

The defendant does claim that the incriminating nature of these items would not have been immediately apparent to a reasonable officer, as all of these items were common household items. However, the trial court properly concluded that this difficulty was overcome by the fact that the victim was present with the officers at the time that they viewed the items, and she immediately identified the property as stolen.[3] All of the necessary prerequisites for the plain view doctrine were thus satisfied and pursuant to that doctrine, the police officers did not need to wait for a search warrant—or establish the existence of exigent circumstances or any other exception to the warrant requirement—before seizing this property.

---

[2] While there is direct testimony in the record concerning the precise point in time that some of the many items at issue were first seen and seized, the record is unclear with respect to the vast majority of the evidentiary items. However, because we uphold the search and seizure with respect to each of these four categories of evidence (albeit on slightly different grounds), it is unnecessary to determine precisely which individual pieces of evidence fall into each of the four categories.

[3] The defendant contends that even in light of the information conveyed to the officers by the victim, the incriminatory nature of the items was not immediately apparent because of "a possibility that stolen property had been transferred in the course of [the] two weeks or more" that had passed since the theft. However, the "plain view" exception does not require that the incriminating nature of the items be evident beyond all reasonable doubt at first glance; rather, the object as viewed must merely "give[] probable cause to believe that it is associated with criminal activity." *United States v. Garcia*, 496 F.3d 495, 510 (6th Cir. 2007); *see also State v. Lillie Fran Ferguson*, No. W2002-00638-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 996, at *10 (Tenn. Crim. App. Nov. 19, 2002) ("Probable cause [sufficient to permit seizure under the "plain feel" doctrine] exists when the facts and circumstances within the officer's knowledge are sufficient to warrant a person of reasonable caution in the belief that the item may be contraband."). We believe that this condition was satisfied in this case.

-22-

The plain view exception also applies to the category of items that were not initially seen from the street but instead first seen by Detective Howell after he entered the defendant's property in an attempt to perform a "knock and talk." Once again, there is no dispute that these items were located in plain view from the officer's position and that they were discovered inadvertently.

Whether Detective Howell was lawfully positioned when he viewed these items presents a more difficult issue. Certainly, with respect to any items that were seen while Detective Howell was in the defendant's driveway or on the way to the defendant's front door, he was lawfully positioned pursuant to the "knock and talk" (or consensual police-citizen encounter) exception. Courts have generally recognized the right of police officers to enter portions of a person's property that are implicitly open to the public for purposes of seeking an individual's consent to perform a search, and furthermore this court has expressly "recognize[d] that 'it is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business.'" *State v. Cothran*, 115 S.W.3d 513, 522 (Tenn. Crim. App. 2003) (quoting 1 LAFAVE, SEARCH AND SEIZURE § 2.3(b) (3d ed. 1996)). Police officers conducting official business have the same rights as members of the general public, and as such they may enter any area of a person's property into which the general public is implicitly invited for purposes of pursuing legitimate business or social interests—such as a sidewalk or pathway leading from a public street to the front door of a residence—because individuals do not have a legitimate expectation of privacy in such areas. *See, e.g., State v. Harris*, 919 S.W.2d 619, 623 (Tenn. Crim. App. 1995) ("What an officer sees from a vantage point along the walkway between the public road and the front door is not protected by either the Fourth Amendment or the state constitution."); *State v. Baker*, 625 S.W.2d 724, 727 (Tenn. Crim. App. 1981) ("It cannot be said a person has an expectation of privacy in the area in the front of his residence which leads from the public way to the front door."). It is clear from the record that Detective Howell had a legitimate investigative purpose for attempting to knock on the front door of the defendant's residence and speak with those inside. Consequently, Detective Howell was lawfully positioned during his trip from the roadway to the defendant's front door.

The officer's decision to move from the front door to the "back" door of the defendant's residence while conducting the "knock and talk" is more troubling. This court has cautioned on numerous occasions that the "knock and talk" exception is not an open license for police officers to prowl through the yards of private citizens or peer through their windows. "Any substantial and unreasonable departure from an area where the public is impliedly invited exceeds the scope of the implied invitation and intrudes upon a constitutionally protected expectation of privacy." *Harris*, 919 S.W.2d at 624 (internal quotation omitted). When Detective Howell stepped off the presumably well-worn path from the street to the defendant's front door, he began treading on constitutionally-dangerous turf.

-23-

However, it is plain from the testimony and exhibits we have reviewed in this case that what the parties refer to as the "back" door of the defendant's residence was actually more akin to a side door, as it was visible from the public street (because the defendant's house was located on a corner lot), there was a path leading to it, and it was not fenced-in. The undisputed testimony in the record is that police officers did not enter into the fenced-in portion of the defendant's backyard until after a search warrant had been obtained. Viewed in the context of the record as a whole, we conclude that the portion of the defendant's back yard that was not fenced in was implicitly open to the public, and in this sense the door located there functioned as a traditional front door for constitutional purposes. Consequently, Detective Howell did not violate constitutional norms by moving from the front door to the "back" door of the defendant's residence in his continuing effort to effectuate a "knock and talk." As before, while the incriminating nature of the items seen during this attempted "knock and talk" might not have been immediately apparent without the assistance of the victim, we do not believe that there was any constitutional difficulty posed by the victim assisting the officer by identifying the items as stolen once they came into view.[4]

With respect to the seizure of the defendant's van and the items located inside, there was conflicting testimony in the record concerning the van's location as well as the position of the officers and the victim when they looked inside of it. There is some testimony in the record that the van was located in the defendant's driveway and that the victim saw the stolen property contained therein while still located on the public sidewalk or in the street. There is also testimony in the record that the van was parked off the driveway behind the house, thus implying that the officer and the victim must have stepped several feet onto the defendant's property in order to peer inside. There is some testimony in between, and some witness's pretrial testimony appears to conflict with their trial testimony on the subject. The trial court made no express finding on the subject, and in the absence of sufficient factual findings, the appellate court may decide where the preponderance of the evidence lies. *Fields v. State*, 40 S.W.3d 450, 457 n.5 (Tenn. 2001).

---

[4] We note that Detective Howell's testimony at the suppression hearing indicates that he and the victim saw one of her missing beds through one of the defendant's windows. As discussed above, peering through windows located on portions of an individual's property that are not implicitly open to the general public is not authorized as part of an attempt to conduct a lawful "knock and talk." However, there is no evidence in the record concerning the location of this window and whether the items located beyond were visible from the street, the front door, or elsewhere open to the public. Moreover, the victim testified at trial that she did not enter the defendant's property until after a search warrant was issued, and we observe that there was no mention made of the missing bed in the affidavit accompanying the police application for a search warrant. Consequently, we find nothing in record that contradicts the trial court's conclusion that all of the items "observed by the officer and the victim in this case before the warrant was obtained . . . were in plain view from a position the viewer had the right to be in."

We find that the defendant's van was parked in her driveway. In this regard, we observe that the defendant testified at trial that when she arrived at her house on the day of the police search, she "pulled around the corner to pull [her] Cadillac in behind [her] minivan and [her] minivan was gone." A short while later, she testified that she "couldn't pull into the driveway" that day because "they [the police] were all in the drive." Taken together, these statements would appear to plainly imply that the defendant believed that she had left her van parked in the driveway. From our review of the testimony and exhibits contained in the record, we conclude that the defendant's driveway, like most suburban driveways, was an area implictly open to the public. Consequently, neither the officer nor the victim[5] offended constitutional norms by stepping into that driveway and viewing items contained in the van.

Once the victim informed Detective Howell that the van contained items that were stolen from her, the officer had probable cause to believe that the van contained contraband. Pursuant to the automobile exception, the officer was free to search the van immediately or have it towed and searched later pursuant to either a search warrant or, as the trial court held, pursuant to the inventory search exception, *see South Dakota v. Opperman*, 428 U.S. 364, 371 (U.S. 1976) (sustaining vehicle inventory procedures as reasonable police intrusions not prohibited by the Fourth Amendment).

With respect to the final category of evidence—the items seized from the defendant's residence and the fenced-in backyard following the issuance of a search warrant—the defendant does not challenge the existence of probable cause sufficient to support the issuance of the warrant. Rather, the defendant urges that the evidence seized pursuant to the search warrant must be suppressed because the warrant was issued "based upon observations, which were made during an illegal entry onto the curtilage of the [defendant's] property," which tainted the subsequently-issued warrant. Because we have held that no such illegal entry occurred, it follows *a fortiori* that the evidence seized pursuant to the warrant is not subject to exclusion as fruit of the poisonous tree.

In sum, the trial court correctly concluded that no illegal search of the defendant's property occurred and that the warrant was sufficiently supported by probable cause. The defendant's claim that the trial court erred by denying her motion to suppress is without merit.

---

[5] The Fourth Amendment generally does not protect an individual against unreasonable searches and seizures conducted by private individuals. *Burdeau v. McDowell*, 256 U.S. 465, 475 (1921). However, constitutional protections may apply if the individual involved acts as "an agent of the state." *State v. Burroughs*, 926 S.W.2d 243, 246 (Tenn. 1996).

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE